**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Adam Schaefer,<br><br>  Plaintiff,<br><br>v.<br><br>Massachusetts Mutual Life Insurance Company,<br><br>  Defendant. | No. CV-20-01108-PHX-JJT<br><br>**ORDER** |

At issue is Defendant Massachusetts Mutual Life Insurance Company's Motion for Summary Judgment (Doc. 52, Mot.), accompanied by a Statement of Facts (Doc. 53, DSOF), to which Plaintiff Dr. Adam Schaefer filed a Response (Doc. 54, Resp.) and Separate Statement of Facts (Doc. 55, PSOF), and Defendant filed a Reply (Doc. 58, Reply). No party requested oral argument, and the Court finds it appropriate to resolve the Motion without oral argument. LRCiv 7.2(f).

**I.     BACKGROUND**

This is a dispute over Plaintiff's entitlement to disability income insurance benefits past December 2019. Plaintiff worked as a licensed dentist. He purchased a disability income insurance policy from Defendant, which became effective on November 7, 2016. Plaintiff alleges that, on or about August 14, 2017, he "suffered severe and sudden eruptive psoriasis and psoriatic arthritis resulting in generalized pain in his neck, back and hips and moderate to severe joint pain in his hands and wrists, among other things," for which he sought medical treatment. (Doc. 1, Compl. ¶¶ 10, 11.)

In December 2017, Plaintiff submitted a claim for Total Disability benefits to Defendant, claiming he was unable to perform the main duties of his work as a dentist as of December 13, 2017, due to

> [a]brupt onset, severe psoriasis [with] suspicion of psoriatic arthritis. Undergoing treatment with [arthritis medication] Humira for above conditions. Osteoarthritis in right thumb at [carpometacarpal (CMC)] and [scaphotrapeziotrapezoidal (STT)] joint. . . . Referred to Rheumatologist for further evaluation, but first available appointment is January 2018 (scheduled at Mayo Clinic). Limited summary of symptoms: numbness and tingling of hands. Severe pain in right hand when performing fine motor movements/applying pressure with thumb. Pain and joint stiffness in neck/back/hips and limited range of motion of the neck. Extreme fatigue. Shakiness of hands after start of Humira.

(DSOF Ex. 3, Insured's Statement for Disability Benefits.)

**A.    Plaintiff's Medical Records -- December 2017 through December 2018**

Plaintiff's Attending Physician, Dr. Aaron Mangold—a dermatology specialist at Mayo Clinic—completed a Statement of Disability in which he diagnosed Plaintiff with psoriasis vulgaris and advised Plaintiff to stop working on December 13, 2017. (DSOF Ex. 4, Attending Physician's Statement of Disability.) Dr. Mangold opined that he did not believe he had "adequate information to make a determination regarding this patient's work-related capacity, including understanding of his/her occupational duties," but rather a primary care physician or rheumatologist should make that assessment. (*Id.*) Nonetheless, Dr. Mangold opined that Plaintiff's expected return to work date was January 24, 2018, presumably because he also opined that Plaintiff's condition should improve when he had been taking Humira for twelve weeks, which Plaintiff began after his October 21, 2017 visit. (*Id.*) Dr. Mangold also stated that workplace accommodations of "limited standing and limited use of hands" would help Plaintiff return to work. (*Id.*)

On December 26, 2017, one of Defendant's Senior Claim Examiners, Philip Moynihan, informed Plaintiff that Defendant had received the documents it had requested from Plaintiff and was working on his claim, including by obtaining copies of Plaintiff's medical records and income history. (DSOF Ex. 6.) On January 25, 2018, Mr. Moynihan

advised Plaintiff he had received all of Plaintiff's financial information and medical records except for those from one doctor, Dr. Jenette Wheeler, and once received, Defendant's medical consultant would review the medical records. (DSOF Ex. 7.)

On February 2, 2018, Defendant's medical consultant, Dr. Thomas Higgins, completed a summary of Plaintiff's relevant medical records and opined on Plaintiff's prognosis. (DSOF Ex. 9.) The medical records included a January 2, 2018 examination report from Dr. April Chang-Miller, a rheumatologist, in which she did not find Plaintiff had significant synovitis (inflammation of the synovial membrane) "but there were multiple areas of tenderness consistent with enthesitis [(inflammation of the sites where tendons and ligaments attach to bones)] and further evaluation including an MRI to assess the possibility of sacroiliitis was recommended." (*Id.* at MM/Schaefer 000497.) Significantly, Dr. Higgins found the medical records provided support for Plaintiff's diagnoses of severe plaque psoriasis and diffuse asymmetric joint pain that may be related to psoriatic arthritis. (*Id.*) Dr. Higgins stated that Plaintiff suffered resulting occupational limitations including pruritis (severe itching), cosmetic changes due to diffuse psoriasis, and diffuse joint pain adversely affecting Plaintiff's work as a dentist. (*Id.* at MM/Schaefer 000498.) Dr. Higgins could not give a prognosis for Plaintiff's partial or full functional recovery because, although Plaintiff's plaque psoriasis was improving with treatment, Plaintiff's "joint pain is of uncertain etiology at this time but may be related to psoriatic arthritis." (*Id.*) Dr. Higgins recommended Defendant obtain an Attending Physician's Statement from Plaintiff "and obtain additional medical records from [Plaintiff's] rheumatologist in another 3 months." (*Id.*)

On February 27, 2018, Defendant informed Plaintiff that it was still awaiting certain medical records. (DSOF Ex. 10.) Ultimately, in the absence of those additional records but in reliance on Dr. Higgins's review, Defendant notified Plaintiff on May 31, 2018 that it approved his claim and provided him with a check for $81,000. (DSOF Exs. 14, 15.) That notification included a statement that the "disability policy has proof of continued disability provisions that require [Plaintiff] to provide [Defendant] with proof of [Plaintiff's] ongoing

disability." (DSOF Ex. 14 at MM/Schaefer 000735.) Accordingly, Defendant requested that Plaintiff and his physician "complete the enclosed Disability Progress Report with Attending Physician's Statement," to be submitted to Defendant "seven days before [Plaintiff's] next scheduled benefit due June 21, 2018." (*Id.*)

On June 15, 2018, Dr. Higgins, Mr. Moynihan, and another employee of Defendant met to review a form provided by Plaintiff containing comments by Nurse Practitioner (NP) Ranieri in Plaintiff's paperwork associated with his leave of absence rights under the Americans with Disabilities Act (ADA). (DSOF Ex. 18.) They found that the form completed by NP Ranieri was not relevant to whether Plaintiff had a continued disability because it contained no reliable medical evidence supporting Plaintiff's disability. (*Id.*) They stated that Plaintiff was required to "provide his rheumatologist an [Attending Physician's Statement form] or at least have the [r]heumatologist write [a] note indicating what the claimant is disabled from." (*Id.*) For example, they asked, "If joint pain, what are the [restrictions and limitations]? Is the joint pain keeping [Plaintiff] from working? Is [Plaintiff] able to function as a dentist? Is [Plaintiff] being treated for joint pain?" (*Id.*)

On June 21, 2018, Mr. Moynihan advised Plaintiff that he had not provided any medical evidence from a rheumatologist to support his claim for a continuing disability, and the last report Defendant had was from Plaintiff's dermatologist, Dr. Mangold, who indicated Plaintiff should be able to return to work in January 2018. (DSOF Ex. 16.) In response, Plaintiff referred to a January 9, 2018 report from an occupational therapist, but even that report stated Plaintiff should meet all functional goals by April 2018. (*Id.*) Plaintiff agreed to seek a note from his rheumatologist that his disability claim is supported. (*Id.*)

On June 28, 2018, Plaintiff sent a summary of prior diagnoses that he prepared himself to Mr. Moynihan, but Plaintiff provided no updated note containing a functional assessment from a rheumatologist, as Defendant requested. (DSOF Ex. 17.) Plaintiff's self-assessment included a reference to the comments by NP Ranieri in his ADA paperwork, (*id.*), which Defendant had already found unsupported by reliable medical evidence. As

Plaintiff himself noted, Ms. Ranieri stated she could not examine Plaintiff hands-on and therefore could not assess when Plaintiff could return to work; she was not medically treating Plaintiff; but she concluded Plaintiff "cannot perform" his essential job functions. (*Id.*)

On July 3, 2018, Mr. Moynihan sent Plaintiff an e-mail that his disability was not supported by any medical records from a rheumatologist and that no objective, reliable medical evidence supported Plaintiff's disability beyond May 2018. (DSOF Ex. 20.) Mr. Moynihan stated that he had requested medical records from Plaintiff's rheumatologist and expected them within the week. (*Id.*) In response, Plaintiff again referred to the ADA paperwork and stated that Defendant's "[f]ailure to make payment immediately will be heavily scrutinized." (*Id.*) Although Defendant did not have the necessary medical paperwork demonstrating Plaintiff's continuing disability, on July 5, 2018, it made payment of $13,500 to Plaintiff "to be of service" to Plaintiff, while Defendant also explicitly reserved and did not waive its rights under the policy, noting in particular that Defendant was contacting Plaintiff's rheumatologist "to gain a better understanding of your restrictions and limitations as they pertain to your occupation." (DSOF Ex. 21.)

On July 19, 2018, Dr. Higgins spoke with Plaintiff's rheumatologist, Dr. Chang-Miller. (DSOF Ex. 22.) She reported she evaluated Plaintiff on January 2, 2018, and again on February 14, 2018, after laboratory testing. (*Id.*) She observed that Plaintiff's plaque psoriasis "responded to Humira but there was not a clear improvement in his musculoskeletal complaints." (*Id.*) She noted that a Mayo Clinic hand surgeon "suggested the presence of deQuervain's tenosynovitis for which an injection was given and some improvement reported." (*Id.*) She further noted that Plaintiff had "recently seen a rheumatologist that is not affiliated with Mayo Clinic who has diagnosed him as having psoriatic arthritis and has changed his treatment from Humira to Enbrel." (*Id.*) Ultimately, Dr. Chang-Miller was "uncertain of [Plaintiff's] rheumatologic diagnosis," including whether he had psoriatic arthritis, and she could not "provide either a prognosis or occupational restrictions/limitations for his work as a dentist." (*Id.*)

Dr. Higgins's next review of Plaintiff's medical record came on July 13, 2018. (DSOF Ex. 23.) The updated review of the record revealed that Dr. Anthony Smith, an orthopedic surgeon, gave Plaintiff a steroid injection for deQuervain's tenosynovitis on January 29, 2018. (*Id.* at MM/Schaefer 000943.) In a follow-up on April 11, 2018, Dr. Smith noted Plaintiff has "some deQuervain's tenosynovitis with a mildly positive Finkelstein maneuver," but no surgery was required. (*Id.* at MM/Schaefer 00094.) Dr. Higgins's review also reported a visit by Plaintiff to NP Ranieri after he was in a car accident as a backseat passenger and suffered stiffness, neck pain and spinal tenderness as a result. (*Id.* at MM/Schaefer 000943.) On February 9, 2018, an MRI of Plaintiff's sacroiliac joint revealed no sacroiliitis and a mild spinal disc bulge at L4/L5. (*Id.* at MM/Schaefer 000943.) As a result, Dr. Chang-Miller's February 14, 2018 assessment stated Plaintiff's low back pain is not due to sacroiliitis and thus "most likely mechanical," for which she recommended physical therapy. (*Id.* at MM/Schaefer 000944.) The reports from both Plaintiff's March 9, 2018 visit to a physical therapist and his April 24, 2018 visit to NP Ranieri stated "Dr. Chang-Miller is unable to specify [Plaintiff's] arthritis but does not feel it is psoriatic in nature." (*Id.* at MM/Schaefer 000945.) In Plaintiff's April 24, 2018 Request for Accommodation under the ADA, NP Ranieri recommended continuous leave of absence until October 17, 2018. (*Id.* at MM/Schaefer 000945.) Plaintiff reported that, through physical therapy, his injuries from the car accident resolved by May 31, 2018. (*Id.* at MM/Schaefer 000945–6.) In a visit with NP Ranieri on June 28, 2018, Plaintiff also reported he had a functional capacity evaluation at Mayo Clinic where he continued to have dysfunction in both hands and wrists; Plaintiff said he would have a functional capacity provider complete paperwork. (*Id.* at MM/Schaefer 000946.)

Dr. Higgins concluded from his July 2018 review of the medical record that Plaintiff asserts occupational limitations including cosmetic changes due to psoriasis, pruritis (itching) causing difficulty sleeping, and diffuse joint pain particularly in the right wrist. (*Id.* at MM/Schaefer 000949.) With regard to wrist pain, Dr. Higgins observed that Dr. Smith indicated Plaintiff's deQuervain's tenosynovitis was "mild and did not require

surgery" and "[t]he current condition of [Plaintiff's] joints has not been evaluated/reported." (*Id.* at MM/Schaefer 000949.) Likewise, Dr. Higgins stated that no attending physician had reported occupational restrictions, and the occupational restrictions asserted by Plaintiff were supported by past medical records but Plaintiff's "current condition is not reported and his current treatment provider and treatment are unknown." (*Id.* at MM/Schaefer 000949.) As a result of the lack of relevant medical assessments, Dr. Higgins opined that Plaintiff's prognosis for functional recovery was "uncertain," as was his "Return to Work Capacity Date." (*Id.* at MM/Schaefer 000949.)

The rheumatologist not affiliated with Mayo Clinic who Plaintiff saw for a "second opinion" was Dr. Alan Mallace; although Dr. Mallace apparently diagnosed Plaintiff with psoriatic arthritis, in contrast to Dr. Chang-Miller's diagnosis, Plaintiff decided not to treat with Dr. Mallace and thus told Defendant it was inappropriate for Defendant to obtain an Attending Physician's Statement from Dr. Mallace. (DSOF Ex. 25.) At the same time, Plaintiff stated "Mayo Clinic Rheumatology will not fill out any paperwork, so this is not another opportunity for you to ask for [an Attending Physician's Statement]." (*Id.*) Although Plaintiff referred to notes from his appointments for occupational therapy at Mayo Clinic—in particular the notes from his August 1, 2018, visit (*id.*)—neither Defendant nor Plaintiff provided those notes as evidence for the Court to consider.

Defendant continued to send Plaintiff monthly checks of $13,500 for benefits on July 24, 2018, August 23, 2018, and September 24, 2018, all the while reserving its rights under the contract and requesting an Attending Physician's Statement from Plaintiff. (DSOF Exs. 24, 28, 29.)

In his next review of Plaintiff's medical record, Dr. Higgins noted an October 16, 2018 evaluation of Plaintiff by rheumatologist Dr. Kevin Moder. (DSOF Ex. 32.) Dr. Moder reviewed Plaintiff's medical history and concluded that Plaintiff "may have a component of psoriatic arthritis" because "approximately 30% of patients with psoriasis have psoriatic arthritis," although upon examination Plaintiff exhibited "no significant psoriasis involving the skin" and "no active synovitis." (*Id.*) From this, Dr. Higgins

concluded that he had a "guarded" opinion of the prognosis for Plaintiff's functional recovery and for a reasonable Return to Work Capacity Date because, while Plaintiff has "responded to treatment and [his] joint symptoms are reported to be mild," Plaintiff "likely . . . has an element of psoriatic arthritis." (*Id.*) Defendant decided to remove its reservation of rights in its December 21, 2018, payment of benefits to Plaintiff, which would remain the case for future benefits payments unless Defendant specifically informed Plaintiff otherwise. (DSOF Ex. 33.) At the same time, Defendant planned for a review of Plaintiff's updated medical records in three months, that is, in March 2019. (*Id.*)

### B. Defendant's Efforts to Obtain 2019 Medical Records from Plaintiff

Mr. Moynihan called Plaintiff on April 25, 2019, to update his medical records. (DSOF Ex. 34.) Plaintiff last consulted with his rheumatologist, Dr. Moder, by e-mail in December 2018 and had not seen any other doctors since. (DSOF Exs. 34, 35.) Mr. Moynihan reported Plaintiff said he had not seen a doctor in over three months because "he was diagnosed with a chronic disease and condition and there . . . is a 'longer recall' in regard to follow up medical treatment." (*Id.*) On May 2, 2019, a medical consultant for Defendant, RN Nancy Gumto, opined that a review with Dr. Higgins should be scheduled because Plaintiff's most recent prognosis was uncertain, the latest records showed Plaintiff's symptoms had improved, and the medical record contained no Attending Physician's Statement or other statement of Plaintiff's restrictions and limitations. (DSOF Ex. 36.)

Mr. Moynihan called Plaintiff again on June 26, 2019, to obtain an update on Plaintiff's status. (DSOF Ex. 37.) Plaintiff reported he had sold his dental practice and moved to Oregon. (*Id.*) He confirmed he was not actively treating with any doctors and stated he had no scheduled medical appointments. (*Id.*) He further stated that "it is the Mayo Clinic's policy that they do not actively participate in the ongoing treatment [of] their patients." (*Id.*) He declined Mr. Moynihan's proposal for a field visit by a representative of Defendant to "obtain clarification of a disability/[restrictions and limitations]." (*Id.*)

On July 17, 2019, Defendant's Claim Department met with Dr. Higgins and determined that Plaintiff's claim should be placed back on a reservation of rights, because it was unclear whether Plaintiff remained disabled, he was receiving no active medical treatment, and there was no current medical evidence supporting functional impairment. (DSOF Ex. 38.) On July 23, 2019, Mr. Moynihan advised Plaintiff of as much, stating that pursuant to the Total Disability provision of the policy, Plaintiff "must be under a Doctor's Care," defined as "receiving care by a Doctor which, under prevailing medical standards, is appropriate for the condition causing the Disability." (DSOF Ex. 39.) Defendant "would waive this requirement if [it receives] written proof acceptable to [it] that further Doctor's Care is no longer of benefit to the Insured." (*Id.*) But Mr. Moynihan noted that, "[a]t this time impairment is unclear as there is no doctor asserting occupational restrictions and or limitations." (*Id.*) Mr. Moynihan asked Plaintiff to provide a Disability Progress Report and Attending Physician's Statement by August 23, 2019. (*Id.*)

In response, on August 21, 2019, Plaintiff stated that he is under a doctor's care by way of injections every other week, which is the prevailing medical standard for treatment. (DSOF Ex. 40.) Plaintiff also again referred to the ADA determination that he was entitled to a leave of absence as proof of functional restrictions and limitations. (*Id.*) Plaintiff also warned, "Failure to pay benefits on time will be considered breach of contract and pursued along with bad faith." (*Id.*)

Two days later, Mr. Moynihan responded by requesting the name and contact information of the doctor administering injections to Plaintiff every other week. (DSOF Ex. 41.) Defendant also provided the monthly benefit check of $13,905 to Plaintiff under a reservation of rights. (*Id.*) Plaintiff responded on September 20, 2019, to say that Mr. Moynihan "already [has] the prescriber and delivery information," that Mayo Clinic will not fill out an Attending Physician's Statement, and that he did not expect to have further medical records until after his December 2019 appointments. (DSOF Ex. 42.)

Once again, Defendant gave Plaintiff his benefit check in September 2019 under a reservation of rights, noting again that "there does not appear to be a doctor supporting

[Plaintiff's] disability" and that the rheumatologist, Dr. Moder, had recently stated in an e-mail that he does not do disability evaluations and could not comment whether Plaintiff is disabled. (DSOF Ex. 43.) In a phone call a few days later, Mr. Moynihan stated to Plaintiff that Defendant's medical consultant determined Plaintiff's disability was only supported until March 2019 and Defendant needed the required medical records to demonstrate continued disability and the care of a doctor. (DSOF Ex. 44.) Plaintiff said he was administering the shots to himself and "there is nothing more for his doctors to do in regard to his disability." (*Id.*) By letter dated September 30, 2019, Defendant informed Plaintiff that, "to be of service to [Plaintiff]," it would continue paying him monthly benefits under a reservation of rights until his December 2019 medical appointments occurred and Defendant could review the associated medical records. (DSOF Ex. 45.)

Mr. Moynihan next called Plaintiff on December 3, 2019. (DSOF Ex. 47.) Plaintiff had treated with Physician's Assistant (PA) Samantha Zunich the week before and switched his medication from Humira to Cosentyx. (DSOF Exs. 47, 48.) He intended to remain a patient of PA Zunich until they could determine if the new medication was effective. (DSOF Ex. 47.) Mr. Moynihan advised Plaintiff that Defendant still had no doctor's certification of Plaintiff's continued disability. (*Id.*) Mr. Moynihan reported that Plaintiff said he had provided "over a hundred pages of medical records" that demonstrated that he has "irreversible joint damage." (*Id.*) Mr. Moynihan disagreed, again pointing out that Plaintiff was not treating with a doctor and had no certification of disability. (*Id.*)

Dr. Higgins's next medical records review, in December 2019, noted that Plaintiff had not seen a rheumatologist since October 16, 2018, which is inconsistent with his subjective report of joint pain, and that no medical opinion of restrictions and limitations existed in the record. (DSOF Ex. 49.) Accordingly, Dr. Higgins concluded that the medical record does not support an ongoing inability for Plaintiff to work as a dentist. (*Id.*)

After Plaintiff again confirmed on December 30, 2019, that he was not seeing or planning to see any doctors (DSOF Ex. 50), Defendant closed Plaintiff's claim on

January 6, 2020, for lack of proof of ongoing disability and for not being under a doctor's care, as required by the policy (DSOF Ex. 51).

Since that time, Plaintiff visited the dermatologist, Dr. Mangold, once in 2020 and once in 2022, but Plaintiff has seen no rheumatologist and no other doctors. (DSOF Exs. 19, 54.) Dr. Moder, the last rheumatologist who examined Plaintiff, in 2018, opined in his deposition that a patient diagnosed with psoriatic arthritis should obtain regular treatment from a rheumatologist, every few months. (DSOF Ex. 60 at 10–12.) He also opined that it is not an appropriate level of care for a patient with psoriatic arthritis not to see a rheumatologist in over three years. (*Id.* at 10–12, 24–25.) Reviewing his 2018 notes, Dr. Moder opined that he did not see any permanent damage in Plaintiff's joints at the time and Plaintiff probably did not have limited joint mobility. (*Id.* at 36–37.)

Plaintiff filed this lawsuit on June 4, 2020, raising claims of breach of contract and bad faith as a result of Defendant's decision to stop paying benefits to him under the policy and Defendant's alleged improper investigation and administration of Plaintiff's claims. (Compl. ¶¶ 37–52.) Defendant now moves for summary judgment on both claims.

## II.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate when the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to prevail as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "A fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes

demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 232. When the moving party does not bear the ultimate burden of proof, it "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). If the moving party carries this initial burden of production, the nonmoving party must produce evidence to support its claim or defense. *Id.* at 1103. Summary judgment is appropriate against a party that "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

In considering a motion for summary judgment, the court must regard as true the non-moving party's evidence, as long as it is supported by affidavits or other evidentiary material. *Anderson*, 477 U.S. at 255. However, the non-moving party may not merely rest on its pleadings; it must produce some significant probative evidence tending to contradict the moving party's allegations, thereby creating a material question of fact. *Id.* at 256–57 (holding that the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment); *see also Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data." (citation omitted)).

### III. ANALYSIS

#### A. Breach of Contract Claim

A breach of contract claim requires a plaintiff to show (1) a contract, (2) a breach, and (3) damages. *Thunderbird Metallurgical, Inc. v. Ariz. Testing Lab.*, 423 P.2d 124, 126 (Ariz. 1967). The interpretation of a contract is a question of law for the court to decide, and the court must give effect to a contract provision as written if it is clear and unambiguous. *Hadley v. Sw. Props., Inc.*, 570 P.2d 190, 193 (Ariz. 1977).

### 1. "Doctor's Care" Provision

In relevant part, the insurance policy Defendant and Plaintiff agreed to included an "Own Occupation Rider," which states:

> Solely for the Monthly Benefits available under this rider, the definition of TOTAL DISABILITY is: TOTAL DISABILITY – The occurrence of a condition caused by a sickness or Injury in which the insured:
> - Cannot perform the main duties of his/her Occupation;
> - Is working in another occupation;
> - Must be under a Doctor's Care; and
> - The Disability must begin while this Rider in In Force.

(DSOF Ex. 2 at MM/Schaefer 000022; Ex. 41.) "Doctor's Care" is defined as follows: "The insured is receiving care by a Doctor which, under prevailing medical standards, is appropriate for the condition causing the Disability. We will waive this requirement if We receive written proof acceptable to Us that further Doctor's Care is no longer of benefit to the Insured." (DSOF Ex. 2 at MM/Schaefer 000012.) "Doctor" is defined as "[a] licensed physician, other than the Insured or Owner, parent, spouse or child of the Insured or Owner, acting within the scope of his/her license." (*Id.*)

At base, Plaintiff claims Defendant breached the policy when it stopped paying disability benefits in January 2020. The undisputed evidence shows that Defendant found to its satisfaction that Plaintiff was under a Doctor's Care from the onset of his psoriasis and psoriatic arthritis through October 2018. After Plaintiff was in contact with Dr. Moder, the last rheumatologist to examine Plaintiff, in December 2018, Defendant stated it would require additional medical records three months later, in March 2019. It is also undisputed that Plaintiff saw no doctor for the whole of 2019. Although Plaintiff self-administered shots prescribed by a dermatologist at that time, he did not seek out any medical evaluation of any kind until he saw PA Zunich—who is not a doctor—in December 2019. Dr. Moder himself testified that such a lack of medical care by a rheumatologist fell below the prevailing medical standard for psoriatic arthritis—the disabling condition Plaintiff alleges he still has. Defendant continued to pay Plaintiff monthly benefits throughout 2019 even

in the absence of the required medical records, but constantly reminded Plaintiff of Defendant's reservation of rights under the policy. No reasonable jury could conclude from the uncontroverted evidence that Plaintiff was under a Doctor's Care in 2019, as required by the policy.

Nor does Plaintiff point to any medical evidence providing that further Doctor's Care was no longer a benefit to Plaintiff, as the policy allowed Plaintiff to obtain. Aside from his own repeated statements to the effect that his condition was "chronic," "irreversible," and "permanent," Plaintiff points to no objective medical evidence to support those claims. His own avowals are not sufficient under the policy. For these reasons, Defendant was justified in ending disability benefit payments to Plaintiff, and Defendant is entitled to summary judgment on Plaintiff's breach of contract claim.

**2.  Proof of Disability Provisions**

The policy also provides:

> In order for Us to pay benefits, We must receive within 90 days after each Monthly Benefit claimed, proof of Disability, and proof of any Loss of Income, if applicable, and any other proof required to substantiate the claim.
>
> If it is not possible to send it within 90 days, send it as soon as is reasonably possible. Your claim will not be reduced because of the delay, but We will not accept proof of loss later than 1 year after it was due. We will make an exception if You were not then competent to make the claim.
>
> Proof of continuing Disability must be furnished monthly or at intervals as We may require.

(DSOF Ex. 2 at MM/Schaefer 000016.)

As the Court laid out in the Background section, above, the evidence undisputedly shows that Plaintiff provided no proof of disability, or any evidence of restrictions or limitations, for at least the whole of 2019. Plaintiff argues that because Defendant already approved disability payments in 2018, Defendant somehow had all the evidence it required to pay his disability payments in perpetuity. But the policy is clear: proof of disability was an ongoing obligation of Plaintiff. He could not meet the obligation with his own

assessments of his condition. Even though he himself has a medical degree, the policy explicitly prohibits the insured from making self-assessments to substantiate continued coverage under the policy. *See Chavez v. Reliance Standard Ins. Co.*, 2015 WL 727929, at *5 (9th Cir. Feb. 19, 2015) (finding the plaintiff did not meet her obligation to prove her disability under the policy where she did "not point to a single opinion from any of her medical providers" to support her allegations of a disabling condition).

Plaintiff argues Defendant eventually denied his disability benefits claim because he did not provide an Attending Physician's Statement, as Defendant repeatedly requested, and that such requests were improper because the policy does not specifically require an Attending Physician's Statement. Plaintiff misses the point. Plaintiff provided *no* proof of disability after 2018, in the form of an Attending Physician's Statement or otherwise. In the absence of a valid excuse, the policy required continuing proof of disability. Plaintiff provided none. For this independent reason, Defendant was justified under the policy to stop making disability benefits payments to Plaintiff, and Defendant is entitled to summary judgment on the breach of contract claim on this basis as well.

### B.    Bad Faith Claim

The tort of bad faith arises when an insurer "intentionally denies, fails to process or pay a claim without a reasonable basis." *Noble v. Nat'l Am. Life Ins. Co.*, 624 P.2d 866, 868 (Ariz. 1981). "The appropriate inquiry is whether there is sufficient evidence from which reasonable jurors could conclude that in the investigation, evaluation, and processing of the claim, the insurer acted unreasonably and either knew or was conscious of the fact that its conduct was unreasonable." *Zilisch v. State Farm Mut. Auto. Ins. Co.*, 995 P.2d 276, 280 (Ariz. 2000). If an insurer conducts a reasonable investigation, it can in good faith deny a claim that is "fairly debatable." *Brown v. U.S. Fid. & Guar. Co.*, 977 P.2d 807, 815 (Ariz. Ct. App. 1998), *as amended* Aug. 5, 1999; *Trus Joist Corp. v. Safeco Ins. Co. of Am.*, 735 P.2d 125, 134 (Ariz. Ct. App. 1986). Mistake, inadvertence or negligence alone are not sufficient to establish a bad faith claim. *Rawlings v. Apodaca*, 726 P.2d 565, 576 (Ariz. 1986); *Miel v. State Farm Mut. Auto. Ins. Co.*, 912 P.2d 1333, 1339 (Ariz. Ct. App. 1995).

Aside from disputing Defendant's decision to deny him continuing disability coverage under the policy—which the Court finds was not only "fairly debatable" but justified, above—Plaintiff offers no probative evidence that Defendant's investigation of the claim was unreasonable. As outlined in detail in the Background section, above, Defendant paid constant attention to the investigation and potential substantiation of Plaintiff's monthly disability benefits payments. Defendant was not obligated, under the policy or otherwise, to arrange for an independent medical examination (IME) or functional capacity evaluation (FCE), particularly in light of the facts that, by 2019, Plaintiff was not under a Doctor's Care, as defined by the policy, for his alleged condition and did not provide medical evidence supporting his self-claims of a disabling condition. *See Frost v. Metro. Life Ins. Co.*, 320 F. App'x 589, 592 (9th Cir. 2009). Indeed, in June 2019, when Mr. Moynihan proposed a field visit from a representative of Defendant to try to help substantiate Plaintiff's disability claim, Plaintiff refused. (DSOF Ex. 37.) From the uncontroverted evidence, no reasonable jury could conclude that Defendant acted unreasonably in investigating, evaluating, or processing Plaintiff's claim, much less that Defendant did so knowingly. Accordingly, Defendant is also entitled to summary judgment on the bad faith claim.

**IT IS THEREFORE ORDERED** granting Defendant Massachusetts Mutual Life Insurance Company's Motion for Summary Judgment (Doc. 52).

**IT IS FURTHER ORDERED** directing the Clerk of Court to enter final judgment in favor of Defendant and close this case.

Dated this 21st day of December, 2022.

Honorable John J. Tuchi
United States District Judge